**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KEVIN MCGURN,

*Plaintiff*,

*v.*

TRILLER GROUP INC. and
WING-FAI NG,

*Defendants*.

Civ. Action No.: 25-cv-5526

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Kevin McGurn ("Plaintiff" or "Mr. McGurn"), represented by his counsel, Katz Banks Kumin LLP, alleges as follows of defendants Triller Group Inc. ("Triller" or the "Company") and Wing-Fai Ng ("Mr. Ng") (collectively, "Defendants"):

<u>**INTRODUCTION**</u>

1.      Mr. McGurn is a seasoned executive with a wealth of leadership experience and a proven track record of driving growth and innovation in the media and music industries.

2.      During the summer of 2024, Triller began courting Mr. McGurn to become the Company's new Chief Executive Officer ("CEO").  Throughout the summer months, Mr. McGurn met with numerous stakeholders of Triller – including major investors, investment bankers, strategic advisors, and key members of the Company's Board of Directors – each of whom enthusiastically approved his hire.

3.      Mr. McGurn and Triller executed an enforceable employment contract in September 2024 (hereafter, the "Agreement" or "Employment Agreement").

4.      At all times between the summer of 2024 and November 14, 2024, Mr. McGurn took steps approved of and encouraged by Triller and Mr. Ng, including building his executive team and presenting his Board-approved vision for the Company's future to major stakeholders.

5.      On October 9, 2024, Mr. McGurn reported in writing his concerns that the Company had engaged in violations of securities laws.  He made that report to Bob Diamond,[1] the Chair of Triller's Board, and Mr. Ng, a leading Triller Board member and President and Group CEO of Triller's predecessor entity, AGBA Group Holding, Ltd.  Specifically, Mr. McGurn raised concerns with Mr. Ng and Mr. Diamond that Triller had knowingly disseminated materially false and misleading information to investors and potential investors, and selectively disclosed material insider information to preferred investors without appropriate safeguards, all in violation of securities laws.

6.      In response to Mr. McGurn's written reports opposing these securities violations, Mr. Ng immediately cut off communications with Mr. McGurn and launched a month-long campaign to undermine him.  Those efforts culminated in Triller's decision on November 15, 2024, to terminate the employment of Mr. McGurn – without cause, and without so much as taking the required Board vote to precipitate his removal.

7.      When Bob Diamond and another Board member explained during a Board meeting prior to Mr. McGurn's firing that terminating Mr. McGurn would obligate the Company to pay Mr. McGurn the sizeable severance promised in the Agreement, Mr. Ng responded with words to the effect of, "Fuck him, we're not going to pay him, we're going to screw him."

8.      Triller then issued Mr. McGurn a letter terminating him, purportedly for cause, to avoid its severance payment obligation.  That letter was rife with demonstrably false allegations.

9.      To date, Triller has failed to pay Mr. McGurn a penny of the millions of dollars it owes him.

---

[1] Robert Edward Diamond, Jr., who goes by "Bob Diamond," and his son, Robert Edward Diamond, III, who goes by "Rob Diamond," are both relevant to the facts of this case. This Complaint will refer to them by Bob Diamond and Rob Diamond, respectively.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), because the amount in controversy exceeds $75,000, and there is complete diversity of citizenship among the Parties: Plaintiff is domiciled in New Jersey; Triller is domiciled in Delaware and California, where it is incorporated and has its principal place of business; and Mr. Ng is domiciled outside of the United States, in Hong Kong, China.

11.     This Court also will have subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), because this action will involve a claim under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX"), a federal law.[2]  This Court will then have supplemental subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), because Plaintiff's state law claims are so related to his SOX claim that they form part of the same case or controversy.

12.     This Court has personal jurisdiction over Triller and Mr. Ng because Mr. McGurn's Employment Agreement expressly provides that "[t]he Parties (i) agree that any dispute between the Parties, including, without limitation, any dispute concerning or arising out of this Agreement or Executive's employment hereunder (or termination thereof) shall be litigated exclusively in an appropriate state or federal court in or closest to New York County,

---

[2] Plaintiff intends to amend this Complaint to include an additional claim under SOX.  Plaintiff is currently exhausting his administrative remedies with respect that claim, which he filed on May 12, 2025 and is pending before the U.S. Occupational Safety and Health Administration ("OSHA").  It will be eligible for removal to this Court on November 8, 2025, once 180 days have passed since its filing with OSHA.  29 C.F.R. § 1980.114(a).

Similarly, plaintiffs pursuing SOX retaliation claims are entitled to a jury.  18 U.S.C. § 1514A(b)(2)(E) ("A party to an action brought [for SOX retaliation] shall be entitled to a trial by jury.").  This means that although Plaintiff's Employment Agreement contained a jury trial waiver, he will nonetheless be entitled to a jury once he amends this Complaint to add his SOX claim.

New York; [and] (ii) hereby consent, and waive any objection, to the jurisdiction of any such court[.]"

13.    This Court also has personal jurisdiction over Triller and Mr. Ng because they (1) transact business in this District and (2) have substantial contacts with this District.

14.    Venue in the United States District Court for the Southern District of New York is proper pursuant to 28 U.S.C. § 1391 and N.Y. Gen. Obl. Law § 5-1402 since: (1) the contract between Triller and Mr. McGurn "(a) is a contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state"; and (2) a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

15.    Plaintiff Kevin McGurn is a seasoned executive in the media and music industries who was selected to become Triller's new Chief Executive Officer in the summer of 2024.  He is a resident of the state of New Jersey.

16.    Triller Group Inc. is a corporation incorporated in Delaware in 2024, with its headquarters located at 2121 Avenue of the Stars, Suite 2350, Los Angeles, California, 90067.

17.    Triller Group Inc. came into existence as a result of a merger between Triller Corp. and AGBA Group Holding Limited ("AGBA"), which was finalized on October 15, 2024.

18.    In connection with the merger, AGBA changed its name to Triller Group Inc.

19.    Defendant Wing-Fai Ng is a resident of Hong Kong.

20.    At all times relevant to this action, Mr. Ng served as a Board member of Triller and the President and Group CEO of AGBA.

## FACTUAL ALLEGATIONS

**A.    Mr. McGurn's Employment Agreement and Early Work for Triller**

21.    Prior to agreeing to join Triller, Mr. McGurn held senior executive positions at several major digital media companies and had established a proven track record of driving growth and innovation in the media and music industries.

22.    For instance, he spent several years as President of Sales and Distribution at Vevo, the Universal Music and Sony Music Entertainment joint venture, and was responsible for leading its expansion as a global music television network.

23.    He previously held senior roles at Hulu, where he helped build the sales team from scratch and generated over $500 million in advertising revenue.

24.    Most recently, he joined T-Mobile in October 2023 as its Vice President and Head of Sales, Marketing and Distribution at T-Ads.

25.    In sum, Mr. McGurn was an ascendant media executive whose expertise, work performance, and professional reputation had led to a series of progressively more high-level and lucrative positions in the digital media industry.

26.    Triller is a video-sharing social media app, and additionally owns Triller Sports, Bare-Knuckle Fighting Championship ("BKFC"), Amplify.ai, and TrillerTV.

27.    Triller is and has been at all times relevant to this Complaint a publicly traded company with equity securities that are registered with the U.S. Securities and Exchange Commission ("SEC") under the Securities Act of 1933, as amended, (the "Securities Act"), and which are traded on the NASDAQ Stock Exchange (NASDAQ: ILLR).

28.    Prior to its merger with Triller Corp., AGBA was a publicly traded company with equity securities registered with the SEC and traded on the NASDAQ Stock Exchange (NASDAQ: AGBA).

29.     Triller began courting Mr. McGurn to join the Company as its CEO in the summer of 2024.

30.     Mr. McGurn was not actively seeking new opportunities at the time; he had just joined T-Mobile in late 2023 and planned to continue his work there for the foreseeable future.

31.     Beginning in July 2024, Mr. McGurn met with and presented his vision of Triller to Bob Diamond, the Chief Executive Officer ("CEO") of Atlas Merchant Capital and Chairman of the Triller Board[3]; Mr. Ng, leading Triller Board member and President and Group CEO of AGBA; Mark Angelo of Yorkville Advisors, a major lender to the Company; John D'Agostini of ClearStreet, the Company's primary investment bank; Triller advisor Jaeson Ma; and Richard Tsai, Triller's largest shareholder, among others.

32.     Mr. McGurn explained his plans to focus on Triller's social media video app to help it compete with TikTok, YouTube shorts, and others, alongside careful management of the Company's TrillerTV service, in part to help generate content for the Triller app.

33.     Each of the stakeholders expressed enthusiasm for Mr. McGurn's vision, and Triller's Board agreed to hire Mr. McGurn as CEO.

34.     Mr. McGurn then engaged in a lengthy negotiation over the following two months regarding his compensation package, insisting on compensation that appropriately compensated him given his level of leadership and the risk involved in leaving his stable position.

---

[3] At the time, the entity now known as Triller Group Inc. was called AGBA Group Holding Limited ("AGBA"). AGBA completed a merger with Triller Corp. on October 15, 2024, and the merged entity assumed the name Triller Group, Inc. *See* GlobeNewswire, *Agba Completes Merger With Triller* (Oct. 15, 2024), https://www.globenewswire.com/news-release/2024/10/15/2963619/0/en/Agba-Completes-Merger-With-Triller.html. Thus, at the time of this July 2024 meeting, Bob Diamond was actually the Chairman of the AGBA Board. For simplicity, this Complaint will refer to the pre-merger entity as Triller, except in cases where the distinction is material.

35.    On September 23, 2024, Mr. McGurn and the Company entered into the Agreement, which is attached hereto as **Exhibit 1**.

36.    The Agreement entitled Mr. McGurn to $500,000 in annual salary, a $500,000 sign-on bonus, a $2,000,000 guaranteed bonus for his first year, a discretionary bonus worth $500,000 per year, and 20,000,000 shares of Triller stock at a value of approximately $2.00 per share.

37.    In conjunction with the merger between AGBA and Triller Corp., on October 15, 2024, the Company reduced the 20,000,000 shares of stock to 9,282,539 shares in a reverse split at a value of approximately $4.00 share.

38.    In sum, the Agreement was worth over approximately $42,000,000 over four years.  Of course, the Agreement could have been worth far more if Mr. McGurn was successful in driving the Company's share value higher.

39.    Mr. McGurn and Triller agreed that Mr. McGurn's formal start date would be on November 18, 2024.

40.    Once the Agreement was signed in late September, however, and with the consent of both Triller and T-Mobile, Mr. McGurn engaged in significant work on behalf of Triller as its incoming CEO, prior to his official start date.

41.    This work included helping to recruit a new executive team, meeting with Triller investors and bankers, helping to prepare fundraising materials, and engaging in daily communications with Mr. Ng and other key Board members, employees, stakeholders, and advisors regarding myriad strategic, financial, and operations matters.

42.    All the directors and stakeholders with whom Mr. McGurn had met had agreed that Triller required a leadership overhaul, and Mr. McGurn was tasked with assisting in

identifying and recruiting new executive hires that would help him implement the new direction of the Company.

43.    Mr. Ng frequently joined Mr. McGurn in meetings with executive prospects and met certain prospects one-on-one on behalf of Triller's Board.

44.    Mr. Ng was uniformly supportive of the executive candidates Mr. McGurn targeted.

45.    On September 26, 2024, Bob Diamond hosted a dinner to celebrate the merger and Mr. McGurn's recent hire.

46.    In addition to Bob Diamond and Mr. McGurn, in attendance at the dinner were Mr. Ng; Mr. Angelo; Mr. D'Agastini; Jim McCann, CEO of 1-800-Flowers.com and newly appointed Independent Board Director for Triller; Chris Tsai, Richard Tsai's son and soon-to-be member of the Triller Board; Rob Diamond, Bob Diamond's son whom the Company was actively targeting to fill a Chief Strategy Officer role; Catherine Polisi Jones, CEO for the public relations agency who worked on the Triller merger; Brian Saunders and David Schamis of Atlas Merchant Capital; and Jeroen Nieuwkoop, Chief Strategy Officer of AGBA.

47.    Mr. McCann prompted Mr. McGurn to discuss the marketplace Triller would be entering into and to explain the vision for the Company to compete with TikTok and become a global media business.

48.    All in attendance expressed tremendous enthusiasm about Mr. McGurn joining the Company as its new CEO and his planned direction for Triller.

**B.    Opposition to Potential Violations of Securities Laws**

49.    On or around September 28, 2024, Mr. Ng began to pressure ClearStreet and BTIG, the financial services firms who served as Triller's investment bankers, to compile an investor PowerPoint slide deck for use on a major upcoming fundraising appeal.

50.     The slide deck was designed to be presented to "Friends and Family."

51.     Based on representations by Mr. Ng and his advisors, Mr. McGurn's understanding is that the deck was for the Tsai family office, i.e., true insiders who were already aware of the Company's recruiting efforts.

52.     Mr. McGurn reviewed and contributed to an early draft of the slide deck and then turned it over to others to carry the effort forward.

53.     Mr. McGurn understood that Mr. Ng was leading the finalization and distribution of the slide deck.

54.     At this time, prior to AGBA finalizing its merger with Triller Corp. on October 15, 2024, and rebranding the merged entity as Triller Group, Mr. McGurn was formally employed by AGBA, and both Bob Diamond and Mr. Ng were Board members of AGBA.

55.     AGBA was publicly traded throughout this entire period.

56.     In early October 2024, Mr. Ng began pressuring Mr. McGurn to quickly complete the hires of Sean Kim, a prospect for Chief Product Officer, and another individual identified as a prospect for Chief Technology Officer (the "CTO Prospect").

57.     Mr. Ng approved sending an offer to an individual identified as a prospect for Chief Content Officer (the "CCO Prospect").

58.     This Complaint does not identify the CTO Prospect or CCO Prospect by name because, unlike Mr. Kim, they never became employees of Triller.

59.     On October 9, 2024, Mr. Kim and the CCO Prospect separately contacted Mr. McGurn to let him know that they had learned that a Triller investor deck was being widely circulated that contained their names and faces, as well as unnamed, but fairly detailed descriptions of other executive hiring prospects.

60.    Further, the version of the deck the Company was circulating did not frame the prospects as potential hires, but rather, as already-hired members of the incoming Triller executive team.

61.    This representation was false and misleading.

62.    Mr. McGurn questioned Mr. Ng about the distribution of the deck, and Mr. Ng confirmed that at least 22 different investors and potential investors had seen some version of the deck.

63.    This distribution was both wider and less controlled than Mr. McGurn had previously been led to believe.

64.    After attending a meeting with AGBA and Triller stakeholders at BTIG's offices that morning, Mr. McGurn discussed concerns about wider distribution of the investor deck – which used Mr. Kim's and the CCO Prospect's faces and names – with investment bankers from ClearStreet.

65.    The ClearStreet bankers explained to Mr. McGurn that the information in the investor deck could be considered "MNPI," or material non-public information, which was being selectively shared with certain investors and prospective investors.

66.    The ClearStreet bankers opined that the disclosure of this material non-public information without appropriate safeguards, such as non-disclosure agreements, could violate federal securities laws.

67.    Alarmed, Mr. McGurn raised concerns about the deck and its distribution with key Board members.

68.     In an email he sent to Bob Diamond and Mr. Ng that same day, Mr. McGurn stated that he "thought this was a total insider round" and that the wider distribution "has put us at risk for recruiting and potentially securities risk."

69.     Mr. McGurn further noted that the prospects on the deck "have only been interviewed and are just now getting verbal offers," and that there was "[n]othing negotiated and nothing papered."

70.     Thus, Mr. McGurn argued it was false to portray them as being part of the Company's incoming leadership team.

71.     Mr. McGurn then flagged that Triller needed to "stop investors from forwarding these materials" and questioned whether non-disclosure agreements needed to be used to accomplish this task.

72.     Such non-disclosure agreements are typical to ensure that recipients of insider information that has not yet been publicly disclosed do not trade on that information in the interim.

73.     The absence of non-disclosure agreements, Mr. McGurn believed, put the Company at risk of violating the SEC's Regulation Fair Disclosure, or "Reg FD," and possibly enabled insider trading.

74.     Mr. McGurn then followed up again with Bob Diamond and Mr. Ng on October 11, 2024, noting that "[c]oncerns continue on the investor deck wider circulation" and asking that they immediately remove Mr. Kim's and the CCO Prospect's names from the deck.

75.     That same morning, Mr. McGurn messaged Mr. Ng, explaining that Mr. Kim had asked "that his face and name be removed from the investor deck."

76.    Mr. McGurn again emphasized the need for non-disclosure agreements regarding the investor slide deck, explaining that proceeding without them was "too risky" – again referring to the risk that the Company was violating securities laws.

77.    Mr. McGurn also spoke by phone about the matter with Bob Diamond and separately with Mr. Nieuwkoop, a top advisor to Mr. Ng, to again detail his concerns.

78.    Mr. Nieuwkoop told Mr. McGurn that he would speak with Mr. Ng about the matter to try to remedy the concerns.

79.    When Mr. McGurn asked Mr. Nieuwkoop whether the Company had required recipients to sign a non-disclosure agreement before sending the deck, Mr. Nieuwkoop responded that Mr. Ng was supposed to have taken care of that.

80.    Mr. McGurn followed up once more about the issue via iMessage to Bob Diamond and Mr. Ng on October 15, 2024. Mr. McGurn wrote that the information concerning Triller's hires was "totally inaccurate," adding: "What is going on??? Are there NDAs in place? How wide is this being circulated?"

81.    Bob Diamond agreed with Mr. McGurn and requested of Mr. Ng, "please do not send any more decks out."

## C.    Isolation and Marginalization

82.    Mr. McGurn's raising of concerns about the misleading content of the slide deck and its wide and uncontrolled distribution began a precipitous souring of Mr. Ng's relationship with Mr. McGurn.

83.    Prior to Mr. McGurn's emails on October 9 and 11, 2024, he and Mr. Ng communicated via WhatsApp many times per week, regarding top-level operations, strategy, fundraising, and executive recruitment issues.

84.    Immediately following the communications in which Mr. McGurn raised securities law concerns, Mr. Ng suddenly cut off direct communications with him.  Mr. Ng stopped sending Mr. McGurn messages on WhatsApp and, for the remainder of Mr. McGurn's time with Triller, never responded to another WhatsApp or email message from Mr. McGurn.

85.    Throughout the month of October, Mr. Ng exerted immense pressure on the Company to accelerate its hires of Mr. Kim and the CCO Prospect, likely due in part to the fact that the Company had distributed a deck falsely representing that those executive prospects had already been hired.

86.    Mr. McGurn sat in on a contentious call between Mr. Ng and Bob Diamond on October 21, 2024.

87.    During the call, Mr. Ng expressed particular frustration regarding "Slide 14" of the investor slide deck – the very slide that Mr. McGurn had suggested created "securities risk" due to misleading content and material non-public information presented preferentially to certain investors, leading the Company to have to take corrective measures.

88.    Mr. Ng also angrily explained to Bob Diamond that Triller needed to hire Mr. Kim right away.

89.    Mr. McGurn did not participate in the heated exchange.

90.    Mr. McGurn, despite not yet working full-time at Triller, had been diligent and proactive in his efforts to hire Mr. Kim.

91.    He first relayed a verbal offer to Mr. Kim during a phone call on October 2, 2024.

92.    Mr. McGurn spoke to Mr. Kim again on October 9, 2024, fielding Mr. Kim's concerns about the Company improperly identifying him in the investor slide deck.

93.    He followed up with Mr. Kim again on October 13, 2024, regarding the Company's offer; spoke to Mr. Kim again on October 14, 2024; and followed up with Mr. Ma, a confidante of Mr. Kim's, on October 15, 2024, regarding Mr. Kim's plans to join Triller.

94.    On October 22, 2024, the Company publicly announced Mr. McGurn as its incoming CEO.

95.    The following day, Bob Diamond and Mr. McGurn hosted an all-hands meeting in which Bob Diamond introduced Mr. McGurn to the Company.

96.    Also on October 23, 2024, Mr. McGurn sent the Company's official written offer to Mr. Kim.

97.    The delay in sending the written employment agreement was caused by Triller's outside counsel and was not within Mr. McGurn's control.

98.    Even after sending the written offer, Mr. McGurn continued to follow up, contacting Mr. Ma on October 27, 2024, and requesting that he follow up with Mr. Kim to ask him if he had any concerns about the agreement.

99.    In late October 2024, Bob Diamond told Mr. McGurn that in several other calls he had had with Mr. Ng following the contentious October 21, 2024 call, Mr. Ng had again expressed his anger about the slide deck and had made particular reference to Slide 14, the slide about which Mr. McGurn had reported securities concerns.

100.    According to Bob Diamond, when discussing his anger about the problems that had arisen with the slide deck, Mr. Ng focused his anger on Mr. McGurn.

101.    On October 25, 2024, Mr. Ng sent a message to Bob Diamond expressing that he had "made a mistake" in hiring Mr. McGurn and that he "should have done more research beforehand."

102.    Mr. Ng did not suggest in this exchange that Mr. McGurn had engaged in any misconduct.

103.    During a meeting with Bob Diamond on October 31, 2024, Mr. McGurn learned for the first time that Mr. Ng was engaging in conversations to try to remove him as CEO.

104.    Mr. McGurn learned that Mr. Ng had been in Los Angeles that week to actively interfere with Mr. McGurn's onboarding and to start working on installing Mr. Kim as CEO instead.

105.    Mr. Ng's effort to remove Mr. McGurn continued during the week of November 4, 2024.

106.    That week, Mr. Ng, Mr. Tsai, and Roger Kennedy, a potential Triller investor, held a series of meetings in Los Angeles with the heads of Triller's lines of business.

107.    During these meetings, Mr. Ng actively disparaged Mr. McGurn's ability to lead the Company, and informed those present that Mr. Kim would be brought in as "President or CEO" of the Triller App.

**D.    Pretextual Termination**

**i.    Mr. Ng pushed through Mr. McGurn's termination without properly advising the Board or seeking a vote.**

108.    On or about November 13 or 14, 2024, Mr. Ng or Bob Diamond convened a meeting of Triller's Board, at which Mr. Ng advocated for Triller to terminate Mr. McGurn's services as CEO.

109.    According to one or more attendees at that meeting, Mr. Ng told the Board that the reason for the termination was that Triller's investors no longer felt that Mr. McGurn was the right person to lead the Company.

110.    According to one or more of those same attendees, Mr. Ng did not mention to the Board any claimed misconduct on the part of Mr. McGurn as grounds for terminating the Agreement.

111.    According to one or more attendees at that meeting, multiple members of the Board responded to Mr. Ng that if Mr. Ng felt strongly about the matter, the Company could terminate Mr. McGurn's employment, but that the Company would then need to pay Mr. McGurn the severance he was owed under the Agreement.

112.    According to one or more of those same attendees, Mr. Ng thereupon responded with words to the effect of, "Fuck him, we're not going to pay him, we're going to screw him."

113.    According to individual(s) present at the meeting, the Board did not engage in any vote regarding the decision to rescind Mr. McGurn's offer or to terminate the Agreement for cause.

114.    The Board's failure to discuss and vote on any claimed "for cause" removal of Mr. McGurn violated Triller's corporate Bylaws, which require that its CEO may be removed from office, "with or without cause," "only by the majority vote of the members of the Board of Directors then in office.  The removal of an officer shall be without prejudice to such officer's contract rights, if any."  *See* Bylaws § 4.02.[4]

115.    Even if a vote occurred, the Board did not base any decision to terminate Mr. McGurn on a presentation of the misconduct he had supposedly engaged in, a necessary prerequisite to any decision to terminate him for cause.

116.    No such grounds were presented to the Board, either at the November 13 Board meeting or prior to that meeting.

---

[4] *See* Bylaws of Triller Group, Inc., § 4.02 (Oct. 21, 2024), *available at* https://www.sec.gov/Archives/edgar/data/1769624/000121390024089342/ea021798101ex3-3_triller.htm.

117.    Immediately following the Board meeting, Bob Diamond texted Mr. McGurn on November 14, 2024: "I am no longer an executive chair [of the Board], that is clear. For better and worse, this is the wing fai [Ng] show."

118.    Mr. Ng thereupon coordinated with Triller's outside employment counsel at Loeb & Loeb, Mark Goldberg, to draft the letter terminating Mr. McGurn.

119.    The following day, November 15, 2024, Mr. McGurn received a letter from Mr. Goldberg detailing claimed reasons the Company was terminating his employment as CEO of the Company, purportedly "for cause" (the "Termination Letter").

120.    The Termination Letter is attached hereto as **Exhibit 2**.

121.    According to one or more attendees at the Board meeting resulting in the termination of Mr. McGurn's employment, the full Board never had the opportunity to review the Termination Letter or the stated reasons for Mr. McGurn's termination before Mr. Goldberg sent Mr. McGurn the letter.

122.    Prior to terminating Mr. McGurn, Triller did not provide him with any notice or opportunity to cure any of the purported for-cause reasons for terminating the Employment Agreement.

123.    Neither Triller, its Board, nor its attorneys had interviewed Mr. McGurn, gathered any information from him, or allowed him to respond to any claim of misconduct prior to baselessly citing them in the Termination Letter.

124.    The Triller Board's acquiescence to Mr. Ng's desire to remove Mr. McGurn and to falsely claim that he was doing so "for cause," without prior discussion of the claimed reasons with the Board or vote by the Board, caused upheaval amongst the Board.

125.    Jim McCann – the veteran business leader and senior executive who had joined Triller's Board less than one month earlier – abruptly resigned from the Board on the same day as Mr. McGurn's removal, apparently out of disgust with Mr. McGurn's termination and the inappropriate process that Triller's Board had used.

126.    Bob Diamond also subsequently resigned his position on the Board.

127.    In a legal filing against Triller shortly thereafter, Bob Diamond wrote: "Particularly in the last couple of months, numerous significant Company events and actions seemingly proceed with no meaningful Board reporting or review at all, including decisions as to key executive management positions, filings with the SEC, capital raising activities and other critical matters that warrant significant Board level review, deliberation and approval."

128.    The Termination Letter cites several supposed bases for Triller's claimed "for cause" removal of Mr. McGurn.

129.    As detailed below, all the claimed bases are patently false and pretextual, and instead were manufactured by Triller, led by Mr. Ng, to terminate Mr. McGurn for retaliatory reasons and to deny him the severance payment he was due under the Agreement.

**ii.      The "Board Plan" did not exist, and Mr. McGurn never deviated from his original vision for Triller.**

130.    First, the Termination Letter claimed that Mr. McGurn developed a "proposed business plan, which completely deviates from the Board Plan and, instead, provides for Triller to become a streaming media service, similar to Hulu."  This is categorically false, for several reasons.

131.    For one, there was no "Board Plan," and certainly no comprehensive written plan, as the Termination Letter's use of the capitalized term "Board Plan" appears to suggest.

132.    To the contrary, during his recruitment process, Mr. McGurn was asked to share his own ideas for the intended direction of Triller.

133.    He shared that vision directly with Bob Diamond, Mr. Ng, and other Triller Board members, key investors, and key advisors, both verbally and in writing, during the period prior to receiving and executing the Agreement, and all stakeholders universally expressed support for his plan.

134.    After signing the Agreement, Mr. McGurn continued to promote this same vision of Triller, and all stakeholders continued to express support.

135.    During those meetings, the plan Mr. McGurn presented to Triller stakeholders was a more detailed version of the same vision for the Company he shared with Mr. Ng, Bob Diamond, and others prior to his hiring.

136.    This was completely transparent, and known to and supported by Triller's Board.

137.    At no point did Mr. McGurn indicate that he wanted "Triller to become a streaming media service, similar to Hulu," nor was that accurate.

138.    At no point did Mr. McGurn suddenly and dramatically deviate from the prior plan which he himself had developed.

139.    Moreover, at no point did any Board member, Triller investor, or Triller management official express concern to him that they believed he had deviated from his prior plan for the Company or from the Board's intended plan for the Company.

140.    In fact, the Termination Letter was the first time that any supposed concerns about this were expressed to Mr. McGurn.

iii.       **Mr. McGurn did not recruit unqualified executives that had not been approved by Triller's Board.**

141.    Second, the Termination Letter claimed that Mr. McGurn targeted for hire former Hulu executives who were "unqualified," and that Mr. McGurn was surreptitiously attempting to replace the current team of senior executives at Triller "who have the requisite experience."  This allegation was also knowingly false.

142.    During his recruitment, Mr. Ng, Mr. Ma, and Bob Diamond discussed in depth with Mr. McGurn their desire to build a new executive team, and to replace the current executive team that they viewed as lacking the requisite background or expertise to implement changes needed to position the Company to succeed.

143.    Indeed, the ability to recruit and hire a new executive team of top-tier professionals was key to Mr. McGurn's decision to agree to leave his job at T-Mobile and take the risk of joining Triller.

144.    Mr. McGurn identified several qualified executives to fill key roles at Triller, some of whom previously held roles at Hulu.

145.    His familiarity with the recruiting targets – which he had by virtue of his overlapping time with these executives at Hulu, more than a decade earlier – was essential, given the need to convince these executives to leave their stable employment at top companies and take a risk on joining Triller.

146.    None of the executives, however, had worked at Hulu in the past ten years, and all had gone on to gain considerable additional experience directly relevant to the goal of designing and supporting a popular social media app, consistent with the plan Mr. McGurn proposed and the Board approved following his recruitment.

147.    For instance, one of the target executives, the CTO Prospect, was a Cornell-educated, former Microsoft database engineer who led the teams at Hulu and Snap in building their ad experiences and monetization platforms.

148.    Another target, the CCO Prospect, who last worked at Hulu in 2014, went on to work for years as the Head of Content Partnerships at TikTok and Spotify.

149.    Contrary to the claim that Mr. McGurn engaged in his recruitment of prior Hulu executives "without providing prior notice to or involving the Company's Board," Mr. McGurn discussed each of these recruiting targets thoroughly with Bob Diamond, Mr. Ng, and other key advisors.

150.    The Board enthusiastically approved of the hire of each of the potential executives Mr. McGurn had proposed, after Mr. Ng had personally interviewed each of them.

151.    In fact, these executives were viewed as such outstanding hiring targets that the Company presented its goal to recruit them as a key aspect of its plan during the "friends and family" fundraising round, with written reference to their backgrounds – including their past work at Hulu – included in the investor slide deck.

152.    Mr. Ng, Bob Diamond, and Triller's investment bankers, among others, reviewed and approved the slide deck with references to these specific recruiting candidates (albeit with their names originally omitted).

153.    The Company was so eager to highlight the CCO Prospect, one of the former Hulu executives, that it included his name and face in the slide deck, falsely suggesting that he and Mr. Kim had already been hired.

154.    At no point did Triller's Board ever suggest to Mr. McGurn that it viewed any of the former Hulu executives it was then targeting for hire as unqualified, or that it wanted to abandon its executive recruitment efforts and stick with its current executives instead.

155.    Indeed, the first time that Mr. McGurn heard this allegation was in the Termination Letter.

### iv.    Mr. McGurn made no representations concerning other competing offers at the time of his recruitment.

156.    Third, the Termination Letter claims – citing no evidence – that Mr. McGurn "misrepresent[ed] other positions that [he was] allegedly being offered."  Exhibit 2 at 2.  This is also false.

157.    At no point during the recruitment process did Mr. McGurn make representations about any competitive offers that he had received, because none existed.

158.    Mr. McGurn had only joined T-Mobile in October 2023, about nine months before Triller began recruiting him to join the Company.

159.    Prior to being recruited by Triller, Mr. McGurn had no plans to leave T-Mobile – he had not been looking for new work and had done no other interviews – so he certainly never indicated that he had other competitive offers in hand.

### v.    Mr. McGurn was transparent concerning his efforts to hire Rob Diamond.

160.    Finally, the Termination Letter references a supposed "clandestine plan" that the Company had "now uncovered" to hire the family member of a Board director and to "hide this from the Board, the management team, and the Company's human resources department." Exhibit 2 at 2.

161.    This accusation apparently refers to the Company's plan to hire Rob Diamond, the son of Board Chair Bob Diamond, as Chief Strategy Officer.

162.    The accusation that Mr. McGurn attempted to conceal this plan from the rest of the Board, management team, or the Company is categorically false.

163.    To the contrary, the potential hiring of Rob Diamond was openly discussed and approved by multiple members of the Board and current Triller management.

164.    As described above, Mr. McGurn attended a celebratory dinner on September 26, 2024, after signing the Agreement.

165.    During the dinner, which Rob Diamond attended, the possibility of Rob Diamond joining the Company as Chief Strategy Officer was widely discussed among the Board members, key advisors, and financial backers in attendance, with all enthusiastically approving of the possibility.

166.    Mr. Ng and Chris Tsai were present at that dinner.

167.    Mr. Ng informed Mr. McGurn at the dinner that both he and Richard Tsai supported Rob Diamond's potential hiring.

168.    Given Rob Diamond's impressive credentials – a degree from Princeton, six years at Deutsche Bank in Global Market Equities, and six years in Corporate Communications for Atlas Merchant Capital, a global investment firm with deep ties to Triller – Mr. McGurn was excited as well, and came away very impressed after speaking directly with Rob Diamond.

169.    The Termination Letter also claims that Rob Diamond was offered "a salary and equity package higher than that of any other current Triller officer."  Exhibit 2 at 2.

170.    While Rob Diamond's pay offer may have been higher than that of current executives at Triller Corp., it was entirely consistent with the offers of the executives then being recruited to work at Triller Group Inc., who would have a greater scope of responsibility overseeing the full Company.

171.    In fact, Rob Diamond's offer was actually tied for the lowest amongst these new Triller Group executives.

172.    On October 16, 2024, Mr. McGurn sent an email to Bob Diamond and Mr. Ng listing the name, proposed position, and proposed compensation of each member of the planned C-suite he was recruiting, including Rob Diamond.

173.    The email reflected that Rob Diamond's planned compensation was tied for the lowest planned compensation offered to any C-suite executive.

174.    Bob Diamond acknowledged receipt of the email and told Mr. McGurn that he would discuss the matter with Mr. Ng.

175.    Mr. McGurn did not hear back from Mr. Ng, Bob Diamond, or anyone else at Triller or on Triller's Board with any concerns about this plan, including any concerns about the hire, planned position, or planned compensation of Rob Diamond.

176.    Before sending Rob Diamond a draft employment agreement, Mr. McGurn spoke directly with Mark Carbeck, the Company's Interim Group CEO, and Mr. Carbeck was fully informed and supportive of Rob Diamond's hire, as well.

177.    On October 24, 2024, Mr. Carbeck emailed Mr. McGurn: "Fantastic – love Rob and think he is/will be great in this role."

178.    After finalizing the Rob Diamond employment agreement, Mr. McGurn sent it to Mr. Carbeck to sign on behalf of Triller.

179.    While the Termination Letter suggests that Mr. McGurn had deliberately excluded the Company's Human Resources ("HR") department from this process, there is, in fact, no centralized HR department for Triller Group Inc., the Company for which Mr. McGurn was the incoming CEO and which would have employed Rob Diamond.

180.    The offers to Mr. Kim, Mr. Thoenson, and other potential Triller C-suite executives – the individuals who would be Rob Diamond's peers at the Company – similarly did not flow through an HR department.

181.    Although Mr. Ng, Mr. Carbeck, and multiple other Board members, advisors, and executives were well aware of the planned hire of Rob Diamond, none of them told Mr. McGurn, at any time, that he should either cease Triller's efforts to hire Rob Diamond or that he should follow any additional processes with respect to the hiring, including but not limited to involving Triller HR employees.

182.    Once again, the first time Triller raised any concern to Mr. McGurn about Rob Diamond's intended hire or that Mr. McGurn should follow a different process for that hire was in the Termination Letter.

**E.    Harm to Complainant**

183.    Triller's capricious and retaliatory decision to terminate the Agreement has caused and will continue to cause Mr. McGurn extraordinary harm.

184.    Indeed, the timing of the termination appears to have been designed to inflict the maximum possible harm on Mr. McGurn.

185.    In early October 2024, after he signed the Agreement, Mr. McGurn notified Bob Diamond and Mr. Ng that his last day at T-Mobile would be November 15, 2024.

186.    Triller then terminated Mr. McGurn on November 15, 2024, ensuring that he could not return to T-Mobile and that he would be left entirely without a job or income.

187.    Instead of the approximately $42,000,000 or more Mr. McGurn was set to earn under the Agreement over just the first four years of employment, Mr. McGurn will now receive none of that compensation.

25

188.    Mr. McGurn was set to receive severance from Triller, guaranteed by the Agreement, valued above $10,000,000.

189.    Specifically, because Triller's reasons for rescinding the Agreement and/or terminating the Agreement for cause were false and pretextual, Triller owed Mr. McGurn the amounts guaranteed to him under Section 7.2 of the Agreement in the case of a termination without cause.

190.    These amounts include his discretionary bonus ($500,000), 12 months of his base salary ($500,000), and immediate vesting of 12 months of unvested equity, which would have been worth $9,073,678.94 at the time of his termination.[5]

191.    Triller's false and pretextual claim to terminate Mr. McGurn "for cause" was purposefully calculated to avoid Triller's obligation to pay Mr. McGurn severance, and has resulted in the denial of that considerable compensation to Mr. McGurn, as well.

192.    Mr. McGurn will suffer huge financial losses over the coming years.

193.    Mr. McGurn's termination has been the subject of numerous articles in mainstream publications, including an article in Business Insider that ran the week after his termination.

194.    The very public, very abrupt, and very unexplained nature of Mr. McGurn's termination has caused serious harm to his professional reputation.

195.    The public nature of his abrupt termination has also caused Mr. McGurn substantial career harm.

---

[5] Following the reverse split, Mr. McGurn held 9,282,539 unvested Triller shares, of which 2,320,634 would have vested over the next year. This figure represents the value of the 2,320,634 shares at the then-current share price of $3.91.

196.    Leading Triller as its CEO was to be the culmination of Mr. McGurn's career, and his separation from the Company deprives him not just of his lost compensation, but of the opportunity to cement his legacy as a top-level industry leader.

197.    Further, under the terms of his employment contract with T-Mobile, Mr. McGurn was required to pay back a significant amount of his T-Mobile signing bonus upon leaving that company.

198.    The $500,000 signing bonus Mr. McGurn was due under the Employment Agreement was specifically designed to allow him to repay his T-Mobile signing bonus and retain a reasonable signing bonus to join Triller.

199.    Since Triller failed to pay Mr. McGurn not only his severance but also his signing bonus, Mr. McGurn was forced to repay the money he owed to T-Mobile out of his own pocket.

200.    Thus, the Company's retaliatory actions not only placed him in debt to his previous employer, they left him unemployed, upended his career, seriously harmed his professional reputation, denied him the eight-figure severance owed to him by the Agreement, and deprived him of tens of millions of dollars in future income.

## CAUSES OF ACTION[6]

### FIRST CAUSE OF ACTION
**Breach of Contract in Violation of New York Common Law,
Against Defendant Triller**

201.    Plaintiff hereby incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 200.

202.    After arms-length negotiations, Plaintiff and Triller executed an enforceable contract, the Employment Agreement, Exhibit 1, on September 23, 2024.

---

[6] As set forth *supra*, *see* ¶ 11 and n.2, Plaintiff intends to amend this Complaint to add his SOX claim once he has exhausted his administrative remedies.

203.    The Employment Agreement was worth over $42,000,000 over the course of four

years at the time of signature and could have been worth far more if Plaintiff was successful in

driving the Company's share value higher.

204.    The Employment Agreement obligates Triller to pay Plaintiff severance, valued at

more than $10,000,000 at the time, in the event of a termination without cause. *See* Ex. 1 at 6–7,

¶ 7.2; *supra* at ¶¶ 188–90.

205.    Under the Employment Agreement, Triller could terminate Plaintiff "for Cause"

by following a prescribed procedure and only under the following circumstances:

> (i) willful and material misconduct; (ii) willful gross neglect of
> Executive's job duties; (iii) material failure to perform Executive's
> material job duties; (iv) refusal to follow a reasonable and lawful
> directive of the Company that is materially related to and
> consistent with the provisions of Section I above; (v) material
> failure to comply with the Company's material written policies and
> practices; (vi) act of moral turpitude, theft, fraud or dishonesty
> concerning the Company or its business and personnel (other than
> any such theft that is immaterial in both amount and significance);
> (vii) indictment for any felony or misdemeanor (other than minor
> traffic violations or misdemeanor offenses not involving
> dishonesty, fraud or breach of trust); (viii) breach of any material
> term of a written contractual agreement between Executive and the
> Company, including, without limitation, this Agreement; (ix)
> improper and willful act that is ( or reasonably would be expected
> to be) materially damaging or detrimental to the Company; (x)
> material violation of any federal securities law, rule or regulation
> or the rule of any securities self-regulatory organization; or (xi)
> becoming a statutorily disqualified person, as that term is defined
> in Section 3(a)(39) of the Securities Exchange Act of 1934, as
> amended (the "Exchange Act").

*Id*.

206.    Throughout September, October, and November 2024, Plaintiff performed

substantial work for Triller.

207.     On November 15, 2024, Triller terminated the Agreement, and claimed in the Termination Letter to be doing so "for cause."

208.     All the claimed reasons for termination in the Termination Letter were false, were never previously investigated or discussed with Mr. McGurn, were not properly presented to, approved by, and voted on by the Board, and were purposefully manufactured to attempt to avoid the Company's severance obligations to Plaintiff.

209.     In the words of Mr. Ng, the Company's goal was to knowingly "screw" Mr. McGurn out of the severance Mr. McGurn was owed.

210.     Because Triller did not have any valid basis to terminate Plaintiff "for cause," his termination was "without cause," obligating Triller to pay Plaintiff the severance owed to him under the Agreement.

211.     Since terminating Plaintiff, Triller has not paid Plaintiff the amount due to him under the Agreement, in breach of Triller's obligations.

212.     Under the Agreement, the parties agreed that the Agreement shall be interpreted and enforced in accordance with the laws of the State of New York.

213.     Triller's breach directly and proximately caused harm to Plaintiff, including lost wages.

### SECOND CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### In Violation of New York Common Law,
### Against Defendant Triller

214.     Plaintiff hereby incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 213.

215.     Plaintiff and Triller are parties to an enforceable contract, the Agreement.

216.    Implied in all contracts, including the Agreement, is a covenant of good faith and fair dealing which is breached when a party to the contract acts in a manner that, although not necessarily constituting a breach of the contract, deprived the other party to the contract of the right to receive the benefits of the agreement.

217.    At all times relevant to this action, Plaintiff performed satisfactorily his obligations under the Agreement.

218.    At all times relevant to this action, Plaintiff was ready, willing, and able to continue performance under the Agreement.

219.    Triller purported to remove Plaintiff as CEO, despite failing to follow the vote procedurally required for such a termination in the Company's by-laws.

220.    To the extent Triller contends it removed Plaintiff "for cause," Triller failed to conduct a reasonable investigation, failed to notify Plaintiff of or allow him to respond to any purported concerns prior to termination, and failed to provide Plaintiff the cure period required under the Agreement.  Exhibit 1 at 4–5, ¶ 6.3.

221.    Instead, Triller followed Mr. Ng's command to "screw" Plaintiff, or words to that effect.

222.    As a result of Triller's bad-faith actions in failing to follow proper procedure to terminate its relationship with Plaintiff, Triller breached the implied covenant of good faith and fair dealing.

223.    At minimum, Triller's failure to comply with its own by-laws and failure to provide Plaintiff an opportunity to cure any purported for-cause grounds for terminating the Agreement cost Plaintiff the $500,000 signing bonus he stood to earn on his first day of work for

the Company, November 18, 2024, just one business day after the day Triller abruptly terminated the Agreement.

224.    In addition, Triller's failure to comply with its own by-laws and failure to provide Plaintiff an opportunity to cure any purported for-cause grounds for terminating the Agreement likely cost Plaintiff substantially more harm in the weeks and months that followed.

225.    Triller's breach of the covenant of good faith and fair dealing was the direct and proximate cause of harm to Plaintiff's professional reputation and his lost wages.

226.    Defendants have harmed Plaintiff in an amount to be determined at trial, but in no event less than $500,000.

227.    Defendants are jointly and severally liable to Plaintiff for all damages owed under this Count.

### THIRD CAUSE OF ACTION
#### Failure to Pay Wages in Violation of the New Jersey Wage Payment Law, Against Defendant Triller and Defendant Ng

228.    Plaintiff hereby incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 227.

229.    The substantive law of New Jersey applies to this dispute because during the two-month period Mr. McGurn performed work for Triller, he was domiciled in New Jersey and performed more than half of his work for Triller from his home in New Jersey.  Mr. McGurn was also located in New Jersey at the time Triller unlawfully terminated his employment.

230.    The New Jersey Wage Payment Law, N.J.S.A § 34:11-4.1 *et seq.*, obligates employers to pay their employees all wages owed to them within a prescribed amount of time.

231.    Plaintiff was an employee of Triller, and both Triller and Mr. Ng were his employers under the meaning of the New Jersey Wage Payment Law.  N.J.S.A § 34:11-4.1(a), (b).

232.    Triller and Mr. Ng contractually agreed to pay Plaintiff wages, including but not limited to severance pay, as agreed upon in the Employment Agreement.

233.    On November 15, 2024, Triller terminated Plaintiff, and claimed in the Termination Letter to be doing so "for cause."  All of the claimed reasons for termination in the Termination Letter were false, were never previously investigated or discussed with Mr. McGurn, and were purposefully manufactured to attempt to avoid the Company's severance obligations to Plaintiff.

234.    Because Triller did not have any valid basis to terminate Plaintiff "for cause," his termination was "without cause," obligating Triller to pay Plaintiff the severance owed to him under the Agreement.

235.    Triller and Mr. Ng failed to pay Plaintiff the wages agreed upon in the Agreement, including but not limited to the severance pay he was owed, for a termination without cause.

236.    Defendants' conduct in failing to pay Plaintiff all wages owed violates the New Jersey Wage Payment Law and has caused Plaintiff harm in the form of lost wages.

237.    Unlawful wage denial under the New Jersey Wage Payment Law is subject to liquidated damages of two times the denied wage amount, in addition to the underlying denied wage amount, and Plaintiff is entitled to such relief.  N.J.S.A. § 34:11-4.10(c).

238.    A defendant may avoid liquidated damages only by showing "that the act or omission constituting the violation was an inadvertent error made in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation." N.J.S.A. § 34:11-4.10(c).  Defendants did not deny Plaintiff the wages in question through an inadvertent error made in good faith, and thus must be assessed liquidated damages.

239.    Plaintiff is therefore entitled from Defendants to the total amount of severance or

any other wages due to him but unpaid, plus two times that amount in liquidated damages.

240.    Defendants are jointly and severally liable to Plaintiff for all damages owed under

this Count.

**FOURTH CAUSE OF ACTION**
**Retaliation in Violation of the New Jersey Conscientious Employee Protection Act,**
**Against Defendant Triller and Defendant Ng**

241.    Plaintiff hereby incorporates by reference as though restated each of the factual

allegations contained in paragraphs 1 through 240.

242.    The New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A.

§ 34:19-1 *et seq.*, prohibits an employer from taking any retaliatory action against an employee

because the employee discloses to a supervisor, or objects to, conduct by the employer which the

employee reasonably believes represents a violation of law, rule, or regulation.

243.    Plaintiff was an employee of Triller, and both Triller and Mr. Ng were his

employers under the meaning of CEPA.  N.J.S.A § 34:19-2(a), (b).

244.    Plaintiff engaged in whistleblowing conduct protected by CEPA when, beginning

in October 2024, he reported to Mr. Ng and other Board members and key advisors his concern

that Triller had distributed a slide deck to investors that was materially misleading, and which

had been sent on a preferential basis to select investors without protections against insider

trading.  In his written communications about this matter, Plaintiff expressly referred to those

actions as creating a "potential[] securities risk."

245.    Plaintiff reasonably believed, and expressed to Mr. Ng and other Triller Board

members and leaders, that Defendants' conduct, which he had reported and objected to, was in

violation of the law, including federal securities laws.

246.     Plaintiff suffered an adverse employment action when, among other things, Triller, led by Mr. Ng, terminated the Agreement, and his employment, on November 15, 2024, and when Defendants refused to pay him the severance owed to him under the Agreement.

247.     Defendants retaliated against Plaintiff because he had disclosed to his supervisors conduct by Defendants which he reasonably believed represented a violation of law, rule, or regulation.

248.     As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer significant economic losses, damage to his career, and professional reputational harm.

249.     Because Defendants' unlawful retaliation against the Plaintiff was performed with malice and with reckless disregard for Plaintiff's rights, and undertaken by upper management of the Company, Defendants are liable to Plaintiff for punitive damages.

250.     Defendants are jointly and severally liable to Plaintiff for all damages owed under this Count.

## **PRAYER FOR RELIEF**

251.     On the First Cause of Action, for lost income and all costs associated with this dispute, including attorneys' fees, an award in an amount to be determined at trial.

252.     On the Second Cause of Action, for lost income and reputational harm, an award in an amount to be determined at trial.

253.     On the Third Cause of Action, for unpaid wages, all costs associated with this dispute, including attorneys' fees and costs, and liquidated damages, an award in an amount to be determined at trial.

254.    On the Fourth Cause of Action, for lost income, damage to career, reputational

harm, all costs associated with this dispute, including attorneys' fees and costs, and punitive

damages, an award in an amount to be determined at trial.

255.    Prejudgment interest on any amounts awarded through this action.

256.    Attorneys' fees and costs.

257.    All such other relief as the Court may deem necessary, just, or appropriate.

**Dated:**        July 3, 2025
               New York, New York

                          **KATZ BANKS KUMIN LLP**


                          /s/ Elena R. Anderson_____
                          Elena R. Anderson
                          Katz Banks Kumin LLP
                          111 Broadway, Suite 1403
                          New York, NY 10006
                          Ph:    (646) 759-4501
                          Email: anderson@katzbanks.com


                          Debra S. Katz (application to SDNY pending)
                          Avi Kumin (*pro hac vice* motion to be filed)
                          Matthew LaGarde (*pro hac vice* motion to be filed)
                          Sarah E. Nesbitt (*pro hac vice* motion to be filed)
                          Katz Banks Kumin LLP
                          11 Dupont Circle, N.W.
                          Suite #600
                          Washington, D.C. 20036
                          Ph:    (202) 299-1140
                          Email: katz@katzbanks.com
                                 kumin@katzbanks.com
                                 lagarde@katzbanks.com
                                 nesbitt@katzbanks.com


                          *Attorneys for Plaintiff Kevin McGurn*